In the Matter of ARTHUR F. TURCO, JR., an Attorney, Respondent. ASSOCIATION OF THE BAR OF THE COUNTY OF MONROE, Petitioner.

Fourth Department, January 28, 1975.

*Michael T. Tomaino* and *Nixon, Hargrave, Devans & Doyle* for petitioner.

*Bruce E. Hansen* and *Wiser, Shaw, Freeman, VanGraafeiland* for petitioner.

*Herald Price Fahringer* for respondent.

*Per Curiam.* Respondent was admitted to the New York Bar on December 21, 1967 in the First Department. He practiced law in the metropolitan area and environs for several years, and in August, 1971 he moved to Rochester, employed as attorney for the new Bail Fund established in Rochester. After six months that employment terminated and he entered private practice in Rochester and vicinity.

In February, 1972 in Baltimore, Maryland, he entered a plea of guilty of common-law assault, a misdemeanor, in satisfaction of May, 1970 indictments against him and others, including a charge of conspiracy to murder and assault with intent to murder, and he was sentenced to a term of five years in the custody of the Department of Correction; but the sentence was suspended and he was released on condition of good behavior for five years. In respect of this, the sentencing Judge said, " If, as Mr. Kunstler suggests, Mr. Turco intends to leave Maryland and take up his activities elsewhere, I can see no useful purpose to be served by active supervision by the Probation Department. "

Thereafter, on March 8, 1972 in the Criminal Court of the City of New York, New York County, respondent entered a plea of guilty of unlawful possession of a weapon in violation of section 265.05 of the Penal Law, as a misdemeanor, in satisfaction of multiple charges made against him and another in February, 1970, including possession of dangerous weapons and drugs, and, later, bail jumping and fleeing the jurisdiction, and he was given a sentence of conditional discharge. He continued to practice law in the Monroe County area.

Under date of May 8, 1973, following a year-long investigation, the Monroe County Bar Association filed a petition with this court attaching thereto the proceedings underlying the above convictions, and asked this court to determine whether respondent should be disciplined by reason of such convictions. Respondent appeared, interposed an extensive answer and moved for change of venue to the First Department, and, in case that was denied, for a hearing on the validity of the convictions as predicates for disciplinary proceedings. We denied the motion for change of venue and received briefs on the question of the right of respondent to present evidence to prove that in fact he was not guilty of the crimes for which he was convicted. In support of his contention, respondent relied on *North Carolina* v. *Alford* (400 U. S. 25).

We concluded that the *Alford* case does not support respondent's contention; that in *Alford* (*supra*), the court merely held that it is proper for a court to accept a defendant's plea of guilty to a lesser crime in compromise of an indictment, provided the plea is voluntarily made (see, accord, *People* v. *Clairborne*, 29 N Y 2d 950; *People* v. *Foster*, 19 N Y 2d 150; *People* v. *Griffin*, 7 N Y 2d 511). As we shall point out later herein, no claim is made, nor can there be, that either of respondent's above guilty pleas was involuntary.

Although respondent suggested that his pleas were reluctantly made and were similar to pleas of *nolo contendere* and hence of no effect in another proceeding (see *Matter of Kimball*, 33 N Y 2d 586), the plea of *nolo contendere* has been abolished in New York (*Ando* v. *Woodberry*, 8 N Y 2d 165, 170) and the records of respondent's pleas show conclusively that they were nothing less than pleas of guilty to reduced charges to avoid convictions for the more serious charges and the severe sentences likely to be imposed thereon. We ruled, therefore, that in the absence of a contention that respondent has evidence " which was unavailable to him " at the time of those pleas (see *Matter of Keogh,* 17 N Y 2d 479, 481) the convictions were final and binding upon him.

We concluded that the acts to which respondent pleaded guilty constitute professional misconduct on his part in violation of canons 29 and 32 of the Canons of Professional Ethics, and Disciplinary Rule DR 1–102 (subd. [A], pars. [3], [5], [6]) of the Code of Professional Responsibility, namely, that a lawyer should strive at all times to uphold the honor and maintain the integrity of the profession and will find his highest honor as an honest man and as a patriotic and loyal citizen, and that he will engage in no illegal conduct involving moral turpitude or that is prejudicial to the administration of justice or that adversely reflects on his fitness to practice law; and that for such misconduct, respondent must be disciplined. We gave respondent the opportunity, however, to have a hearing in mitigation of the discipline to be adjudged.

Respondent requested such a hearing, and a Justice of the Supreme Court was designated to hear and report the evidence presented on such hearing. The hearing was held over a period of seven days and is contained in 800 pages of minutes. Respondent called over 45 witnesses, about 40 of whom were from the Rochester area who did not know respondent before he came to Rochester in 1971 and did not know anything of his prior conduct. They testified to his high ability as a lawyer and his good character. The hearing Justice gave respondent full leeway and opportunity to explain his conduct and his reasons for pleading guilty. Respondent's testimony and supporting evidence submitted in refutation of the evidence which the State's Attorney in Maryland and the District Attorney in New York stated to the respective courts that they would present on trial of respondent if he did not plead guilty, was detailed and quite complete. In consideration of the matter of mitigation we have reviewed the evidence underlying the charges against respondent which led to his plea of guilty in each of his convictions, and his explanations thereof.

In 1968, soon after he was admitted to the Bar, respondent began employment by William Kunstler in Manhattan. He soon was engaged in representing the Black Panther Party. He testified that Messrs. Kunstler, Lefcourt and he were the first attorneys to represent the Black Panthers on the East coast of the United States, that their services required respondent's appearance in various cities from New England southerly in the East coastal States to Maryland, and that the services were rendered for little or no fee, as the circumstances required. He also represented other indigent persons. He assisted Mr. Lefcourt in

a nine months' trial of the so-called "Panther 21" in New York City.

In February, 1969 members of the Black Panther Party in Baltimore, Maryland, were accused of arson, bombing and other crimes. Members of that party who were residents in New York were extradited to Maryland, and respondent went there to represent them. From the statement of testimony which the State's attorney of Maryland advised the Criminal Court of Baltimore, at the time of respondent's conviction there, that he was prepared to present against respondent upon his second trial and which respondent stipulated would be the testimony against him, it appears that in the early summer of 1969 respondent was engaged in rendering more than normal legal services for the Black Panthers in Maryland. He joined members of the Black Panther Party on the streets of Baltimore in passing out editions of the Panther paper; he presided over political action classes of the Black Panther Party; and he took an active part in the activities of that party there. He testified that he also traveled to many eastern United States cities, setting up police control districts, a project sponsored by the Black Panthers, and he advised the party in connection therewith.

It was stipulated before the Maryland court that if the second trial of respondent were to proceed, the State's witnesses would testify to the following facts:

In early July, 1969 one Eugene Leroy Anderson joined the members of the Black Panther Party and respondent in the distribution of Black Panther literature on the streets of Baltimore. On July 10 Anderson appeared at the Black Panthers' headquarters in Baltimore and became involved in an argument with certain members there. It appears that a captain of the Panthers had been demoted and some members wanted him restored. There was also suspicion that some members were divulging to the police certain Black Panther activities. A number of Black Panthers forcibly carried Anderson upstairs, followed by respondent. There Anderson was slapped, punched and beaten. On one occasion he fell against a file cabinet and respondent grabbed him and threw him to the floor, and another member kicked him in the groin causing him to yell out in pain. A cloth was stuck in his mouth to quiet him. Water in a pan was brought to a boil, sugar was put into it and a hunting dagger was heated in it. The dagger was then placed in the skin under his eye and turned " rolling it down the face, which removed the first layer of skin on Anderson's face ". The same thing was then done to his chest. A member took Anderson by the head,

placed a .38 caliber revolver against it and said that he was going to kill him. Another member lit a cigarette and placed it against Anderson's face under his eye, burning him. Members present, including respondent, continued beating Anderson, sometimes with bed slats. Respondent then said, "We can't keep him here; we have to off him", meaning "We have to get rid of him [Anderson], we have to kill him." Anderson was kept there under guard all night and the next day, and was tied up and put in a closet. Anderson was called a "pig" who had been caught —apparently squealing.

Two Black Panther members, Loney and Wyche, who had supported the demoted captain, were berated by one Mitchell. Respondent was present at the time and encouraged Mitchell in his derogatory remarks against them. Mitchell and respondent told them that they could get back in the good graces of the party by disposing of Anderson and respondent told them to "go ahead and do what they had to do with Anderson".

The State's attorney stated to the court that Loney would testify that Wyche and he, with one Johnson, then drove out to find a spot where they could kill Anderson, and they found one. That night after respondent had finished presiding over a Black Panther political action class, he told Wyche and Loney to "go and do what you have to do", meaning "get rid of Anderson". Later that night, July 11, Wyche, Loney, Johnson, Young and another got a gun and took Anderson in an automobile to the spot previously selected. Loney stayed in the car while the others took Anderson into the woods. Loney heard the gun blast, and the escort soon returned without Anderson. Wyche reported that he had shot Anderson.

The State's attorney stated that another witness, Barbara Zentz, would testify that she expected respondent to come to her house that evening on a social visit. He was late, and she fel' asleep waiting for him. He came after 1.30 A.M. on July 12 and awakened her. He was extremely agitated and had a revolver in his hand which he waved, and he said that if "they" (meaning the authorities) came to get him, "he would take some of them with him." He asked her to hide him but she declined.

In October, 1969 the body of Anderson was found in Leakin Park, Baltimore, and it was duly identified.

On February 22, 1970 in Manhattan, New York, the police, acting on a tip, apprehended four adults and found that one of them was carrying an automatic gun. They arrested the four and were about to place them in police cars to take them to the stationhouse when three other men appeared, one being Alan

Weiser, a lawyer. He told the police that they had no right to arrest the four or take them in, and he stood between the men and the police cars to prevent such police action. The other two with Weiser aided him, and so the police also arrested the three. Weiser gave his address as 674 W. 161st Street, Apartment 6–G.

Officers Valois and Nichols then went to that apartment and knocked. Someone within asked who was there, and they replied, "Police officers". It happened that there was an uncovered peephole in the door, and Officer Valois looked in and saw a man standing there holding a gun in his hand. The man (James Grace) dropped the gun and started running down the hall of the apartment. Officer Valois broke into the apartment and found that the gun was a M-1 carbine loaded with a banana clip of 30 rounds of bullets. He caught Grace in the kitchen and he called out that everyone was under arrest. Respondent and two girls then came out of a door near the kitchen. In the living room the officers saw a shotgun leaning against the window and 12 live shells on the windowsill; and they found on an end table two plastic bags, one containing marijuana and the other 125 green pills. While Officer Nichols was lining up his prisoners he heard a door open to his left. He looked and saw in a room next to the kitchen holstered revolvers and bandoliers full of shells on top of a valise only about five feet from him. He immediately seized them.

Respondent then spoke up, saying, "What are you guys doing? All these guns are registered." Officer Nichols said, "What about the small guns?", and respondent answered, "These weapons are all mine and they are registered." Respondent admitted that he and his girl friend, whom he later married, were also living in the apartment. The officers found 75 hypodermic needles in the apartment; and they learned that the revolvers were not registered or licensed.

On February 23, 1970 Weiser and respondent were charged with possession of dangerous weapons, dangerous drugs, hypodermic instruments and obstructing government administration. Respondent pled not guilty and he was released on bail. His motion to suppress the guns, ammunition, drugs and his statements that the guns were his was denied.

On the mitigation hearing herein respondent testified that in the course of his activities in behalf of liberal causes he made many speaking appearances and that in late April, 1970 he went to Montreal, Canada, to make a speech at McGill University, intending to return in a day or two. The fact that he was out on

bail did not deter him from leaving the State without permission. He did not, however, speak in Montreal.

On May 1, 1970 respondent was indicted in Maryland along with Mitchell, Wyche and another for conspiring to murder Eugene Leroy Anderson on July 11, 1969; and he also was indicted with Mitchell and others for assaulting Anderson with intent to murder him and for common-law assault. Respondent testified that McGill University canceled his speech on learning of his indictment. Respondent learned of the indictment almost immediately and he testified that through an associate attorney in Baltimore he unsuccessfully negotiated to be released on bail if he returned to Maryland.

Respondent remained in Canada for 7½ months. During this time he forged a lost identification card which came into his possession, falsifying it as his own, and he assumed the name of Leon Wright. He made no attempt to appear in the case pending against him in Manhattan and his bail there was forfeited. In mid-October, 1970 an official in Canada was kidnapped, a state of emergency was declared and the police investigated thousands of persons. In the course of this investigation respondent was "picked up" and he gave his name as Leon Wright, using his false identification card. His identity was discovered, however; and the police, on learning that he was under indictment for murder in Maryland, notified the Maryland authorities, and they began an extradition proceeding against him.

In the course of such extradition proceeding respondent signed a waiver, and in mid-December, 1970 he returned to Maryland with two Maryland police officers, where he was kept in jail until the end of his three weeks' trial in June and July, 1971. The jury acquitted the other defendants indicted with respondent, but they disagreed as to him. He was then released on bail, awaiting a new trial, and in the following month he first came to Rochester, as before stated. Although the other above-mentioned persons indicted with respondent were acquitted, one Irving Young was tried separately for the murder of Eugene Leroy Anderson and he was convicted thereof.

In February, 1972 the State's case against respondent in Maryland came on for retrial. At that time on February 14, 1972 respondent was represented by Mr. Buchman of Baltimore and Mr. Kunstler of New York. Only one of the four indictments (Nos. 2313, 2314, 2315, 2316) against respondent was called for trial, to wit No. 2314, and Mr. Buchman stated that respondent would plead guilty to the second count thereof, that is, common-law or simple assault, in satisfaction of all the indictments

against him. The State's attorney told the court that the State recommended accepting the plea, being mindful that the first trial took three weeks and that the second trial would probably take longer, that respondent had already spent many months in jail awaiting the first trial, and that by pleading guilty to assault respondent was exposing himself to sanctions by the Bar Association of the State of New York and would be subject to disbarment proceedings in New York. Before considering whether the court would accept respondent's plea with the State's approval, Presiding Judge J. Harold Grady had respondent sworn and he questioned him to ascertain whether his plea was voluntarily made. The court elicited that respondent was an attorney at law and fully acquainted with the law of his case and his legal rights and had thoroughly discussed his case with his attorneys before offering to make his plea and was doing so voluntarily.

The court then called upon the State's attorney to present for the record the evidence which the State asserted supported the guilty plea. The State's attorney stated that respondent's attorney had stipulated that the evidence which the State's attorney was about to recite, including the names of the respective witnesses, would be the State's proof if the case proceeded to trial, and respondent's attorney agreed that such was the stipulation. The substance of such testimony was set forth above in describing the events surrounding the beating and shooting of Eugene Leroy Anderson. The tesimony also described the use by respondent of the falsified identification card in Canada and the false name of Leon Wright and the fact that he remained in Canada for 7½ months until termination of the extradition proceedings against him.

Following such statement of the State's evidence Mr. Kunstler, for respondent, stated the nature of the evidence which the defense would present were the case to proceed to trial. He stated that he would present evidence to show that respondent was in New York City, not Baltimore, on July 10 through July 12, 1969; and Mr. Kunstler stated that respondent contends that "he was totally innocent of all the charges". The court then said:

" It was my understanding from the conversation I heard that the defendant would not contend that there was no factual basis for the plea and that it was being entered to avoid litigation. It was specifically agreed that the guilty plea was not to be similar to the type approved by the Supreme Court in North Carolina v. Alford. It was my understanding there was

to be no contest as to the basic fact that an assault was committed by the defendant. * * *

" As I understand it, when the factual statement was to be made by the State there would be no contest as to the facts. Up to the time of the very end of your statement, when you said Turco himself would testify, your recitation of what the witnesses would say could be covered by a finding that there was a factual basis. But if Mr. Turco's position is he does not feel in any way that he has ever done anything wrong and wishes to assert that position on the record, apparently the State is not prepared to follow through with its recommendation on that basis.

" MRS. O'CONNER: Correct. We would ask the entire portion starting ' If Mr. Turco were called to the stand . . . ' to be deleted at this point and the plea continue with the completion of the last witness, Mr. Clark.

" MR. KUNSTLER: I would agree to that."

The court then stated: " So that there be no misunderstanding of the state of the record in this case, at the outset of the State's recital of its evidence there was a stipulation that this would be the State's evidence as produced on direct examination. There has been no stipulation or agreement by the State as to what the evidence offered by the defendant might be, so that there has been no stipulation on the part of the State to any evidence which would support the outline as given by Mr. Kunstler. Since the State's outline of its evidence clearly supports the plea of guilty, the crime of assault, and since the defendant elects to present no evidence to controvert this charge, the Court finds there is in fact a factual basis for the plea of guilty to the crime of assault." Before pronouncing sentence, the court concluded as follows: " As has been pointed out in the discussion here today, the defendant, Arthur Turco, is not a member of the Bar of the State of Maryland. However, I believe that there have been some suggestions that he has offered his services as an attorney to some persons in this jurisdiction who are charged with criminal offenses. The possibility of Mr. Turco participating in the defense of any criminal case in this State would depend upon his being presented to the Court by local counsel with a request that he be permitted to participate in that one case only on a case-to-case basis. Speaking for myself only, and not attempting to speak for any other court in this jurisdiction, I would make it clear that if such an occasion would arise in the

future, Mr. Turco would not be permitted by this Court to act as counsel in any criminal case at trial before this Court."

On March 8, 1972 respondent appeared in the criminal court of the City of New York, New York County, and offered to plead guilty to illegal possession of a dangerous weapon, a gun, in satisfaction of all charges against him, including bail jumping and fleeing the jurisdiction. His attorney, Mr. Lefcourt, stated that respondent had no knowledge of the presence of the handguns or marijuana in his apartment where he was arrested and that the hypodermic needles were for respondent's use as a diabetic. He did not attempt to explain why 75 hypodermic needles were needed for such purpose. He asserted that his plea was under *North Carolina* v. *Alford* (400 U. S. 25, *supra*) and that respondent still claims that he was innocent.

The District Attorney replied that the facts "clearly demonstrate the guilt of the defendant", and he proceeded to recite them, as reviewed above; but he concluded by stating that he was willing to accept the one plea in full satisfaction of all charges against respondent. Respondent's attorney stipulated that the People's witnesses would testify to the facts recited by the District Attorney.

The court then questioned respondent and ascertained that his plea was made freely and knowingly; and he added, "After having entered this plea, do you understand I will not permit you to withdraw it under Alford v. North Carolina, on the basis of your assertion of innocence, later on?"; and respondent answered, "I understand, your Honor."

Respondent appealed from the judgment convicting him in Maryland. The appeal was argued on March 2, 1973 and on June 13, 1973 the court of Special Appeals of Maryland affirmed the judgment.

Respondent appealed from the judgment convicting him in New York County of illegal possession of a dangerous weapon, and on December 19, 1972 the Appellate Term of the First Department unanimously affirmed the judgment.

With respect to the New York County conviction respondent testified on the mitigation hearing that he had moved into the Manhattan apartment only a few days before his arrest; that he brought with him two guns, the shotgun and the rifle, which he had formerly used for hunting; and that he registered them when he moved to Manhattan. He stated that the revolvers and ammunition therefor were in the room of his codefendant, Weiser, in the apartment and their presence was unknown to respondent. He admitted that he had in the apartment up to

200 shells for his shotgun an up to 150 shells for his rifle. He testified that when he told the officers that the guns were his he was referring only to the shotgun and rifle and not to the unlicensed revolvers, despite the officer's testimony that respondent's statement was in response to his question about the small guns. Respondent offered no explanation of how the shotgun and the rifle, purportedly used only on rare occasions for hunting, were both in the living room with live ammunition in them and openly at hand.

Respondent further testified that the reason he falsified the identification card in Canada and carried it and used the name of Leon Wright was to avoid arrest and extradition to the United States.

Respondent reiterated on cross-examination that he pled guilty in Maryland and in New York County with full knowledge of the charges, facts, and law, and did so voluntarily and on advice of his counsel.

The essence of respondent's testimony on the mitigation hearing was (1) that because of his active defense of minority persons in Maryland, especially blacks, he could not get a fair trial there, and that is principally why he pled guilty rather than stand trial. His wife's ill health and his lack of funds for counsel fees for his defense were also stated as important considerations; (2) that his wife's ill health and the expense of defending himself against the New York County charges were also why he pled guilty there; (3) that he has been devoted to the defense of minority groups and underprivileged persons, largely without fee, and has performed a public service for which he should be commended instead of being charged with unprofessional conduct; and (4) that since his convictions he has conducted himself in an exemplary manner, continuing to defend the poor and defenseless and unpopular causes, and should be permitted to continue to do so.

The petition herein charges respondent with misconduct by reason of the two convictions above described. We have determined that such misconduct requires that he be disciplined. In an effort to mitigate the discipline to be adjudged, respondent presented his version of the facts underlying and surrounding the convictions. In considering such testimony we necessarily have reviewed the countervailing proof, to wit, the facts which the State of Maryland and the People of New York stated that they would prove upon a trial to establish respondent's guilt, many of which facts were admitted by respondent or not denied. Those alleged facts and respondent's answers thereto are neces-

sarily weighed by us in considering respondent's character and his respect for the law and his responsibility to the Bar as a lawyer.

The Maryland court accepted the recommended plea of common assault; but it clearly did not view the crime as a mere street corner fist-fight, for it imposed a five-year sentence, suspended during respondent's good behavior. After respondent's arraignment in New York County on the various charges there, the court recognized respondent's position as a member of the Bar and released him on bail on his own recognizance, thus relying on his integrity as an attorney at law to abide by the rules governing persons released on bail and to be available at all times for the prosecution of the case. Under such circumstances his admitted jumping bail, which in itself constituted the commission of a felony (Penal Law, § 205.40), shows a significant lack of good character. Although this fact is not a basis upon which the petition rests, in his testimony in mitigation respondent has adverted to his *incognito* stay in Canada, and such testimony must be considered in light of all the surrounding facts.

The evidence in behalf of respondent shows that he engaged in representing people who desperately needed representation and who often had difficulty finding able counsel, and that he, as an attorney, had a proper concern for underprivileged persons. The testimony of the many witnesses who testified to respondent's good character must, however, be recognized as based upon his conduct since he came to Rochester in 1971, during which time he was subject to the Maryland and New York County charges or the pressure of the Bar Association's investigation for his prior misconduct. Were the admitted facts in this proceeding to appear on the record of an applicant for admission to the Bar, without doubt the application would be summarily denied.

In his argument in mitigation of respondent's conduct and consequent punishment, his counsel likens respondent's actions to those of an attorney who has been charged with tax fraud or tax evasion. We cannot accept such comparison. Defendant has been charged with crimes involving gross moral turpitude, including violence and a display of utter lack of moral responsibility. Even in his testimony at the mitigation hearing he evinced no showing of remorse or recognition of wrongdoing. Respondent's conduct in 1969 and 1970, as recited above, reveals that he had little respect for legal processes insofar as they applied to him and his ambitions. He left the arena of the

lawyer in the proper defense of clients charged with crime and joined his clients in criminal activity and when caught in the web of the law, he refused to abide by lawful mandates and undertook illegal means to evade the law and conceal himself. He flouted the law. His actions were completely un-lawyerlike, unprincipled and far below any minimum standard of proper professional conduct. Such conduct in a practicing lawyer cannot be tolerated. For his admitted actions herein we have no choice but to order that he be disbarred and that his name be stricken from the roll of attorneys of the State of New York.

An order should be entered accordingly.

MARSH, P. J., MOULE, SIMONS, MAHONEY and DEL VECCHIO, JJ., concur.

Order of disbarment entered.